**LOUISIANA PACIFIC CORPORATION,**
a Delaware corporation, Plaintiff,

v.

**BEAZER MATERIALS & SERVICES, INC., A Delaware corporation, as Successor in Interest to Koppers Company, Inc., a Delaware corporation, et al., Defendants.**

And Related Third–Party Action.

No. Civ. S–89–871 LKK.

United States District Court,
E.D. California.

Feb. 1, 1994.

James C. Collins, Thelen, Marrin, Johnson & Bridges, San Francisco, CA, for Louisiana Pacific Corp.

David B. Glazer and Helen H. Kang, U.S. Dept. of Justice, Environmental Enforcement Section, San Francisco, CA, for the U.S.

Anne M. Lawlor Goyette, Bronson, Bronson & McKinnon, San Francisco, CA, for Woodward–Clyde Consultants.

Patrick J. Cafferty, Jr., Munger, Tolles & Olson, San Francisco, CA, for Beazer Materials & Services [Beazer East].

**1246**

Malcolm S. Segal, Segal & Kirby, Sacramento, CA, for Koppers Industries.

### ORDER

KARLTON, Chief Judge Emeritus.

This litigation concerns the allocation of the cost of cleaning up two Superfund sites on the National Priorities List ("NPL") established pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–75. The original suit was brought by Louisiana Pacific ("LP") against Beazer East, Inc. ("Beazer"). It sought costs expended by both LP and the Environmental Protection Agency ("EPA") in the course of investigating those sites.[1] LP also sought declaratory judgment concerning future liability under the Act. See Louisiana Pacific Corp. v. Beazer Materials & Services, Inc., 811 F.Supp. 1421 (E.D.Cal.1993).

The United States, however, has now filed a complaint seeking to recover from LP its response costs pursuant to 42 U.S.C. §§ 9607 and 9613(g). In response, LP filed a third-party complaint against Beazer,[2] and Woodward–Clyde Consultants ("WCC"). The third-party complaint seeks CERCLA contribution and declaratory relief against Beazer pursuant to 42 U.S.C. §§ 9607(a) and 9613(f). It also alleges claims for negligence and for violation of Cal.Bus. & Prof.Code § 17200 against WCC.[3]

LP now moves for summary judgment on the Government's complaint, arguing that the United States is precluded as a matter of law from recovering its costs of the investigation of the LP site because EPA unlawfully conditioned LP's opportunity to conduct its own, potentially lower cost investigation, on the company's waiver of various due process rights. See Louisiana Pacific Corp., 811 F.Supp. at 1424. Beazer and WCC join that motion pursuant to Fed.R.Civ.P. 14, arguing that because the United States may not recover these costs from LP, any claim by LP attempting to pass these costs along to them must fail. The United States has cross-moved, contending that as a matter of law the position it took during the failed settlement negotiations cannot bar its claim for cost recovery. In the alternative, the United States argues that should this court conclude that EPA may not condition LP's opportunity to conduct its own study upon the waiver of certain constitutional rights, summary judgment may nonetheless not be granted to LP and third-party defendants because disputed issues of fact remain as to the cause for the failed negotiations.[4]

The standards for resolution of a motion for summary judgment are well-known and need not be set out here. See, e.g., Clark v. Kizer, 758 F.Supp. 572, 574–75 (E.D.Cal. 1990). For the reasons herein stated, LP, Beazer and WCC's motions seeking dismissal premised on the doctrine of unconstitutional conditions are denied, and the United States' motion relative to that claim is granted in part and denied in part.

---

1. Opinions addressing federal environmental statutes customarily employ acronyms. What once was a useful tool now has the force of tradition and acronyms are now used whether they aid or obscure communication. Moreover, environmental litigation tends to generate a patois unique to each statute, see infra, e.g., note 6, and generally requires expert testimony frequently expressed in the special jargon of the witness' field. I occasionally daydream of writing an opinion employing only acronyms, patois, jargon and scientific terms. If done properly, such an opinion, like many of the briefs I receive, would not be subject to criticism for being in a foreign language, but nonetheless, would be utterly incomprehensible.

2. LP's third-party complaint denominates as defendants Beazer Materials & Services, Inc., Beazer USA, Inc., BNS, Inc., BNS Sub, Inc., BNS Acquisitions, Inc., Beazer PLC, Koppers Industries, Inc. and Woodward–Clyde Consultants. This opinion will refer to all defendants except Woodward–Clyde Consultants as "Beazer."

3. LP's original suit against Beazer and the suit by the United States and LP's third-party complaints have all been consolidated.

4. Also before the court is WCC's motion for summary judgment as to LP's third-party claim against it. That motion will be disposed of in a separate unpublished opinion. See Kouba v. All-

# I

## FACTS[5]

On February 13, 1986, the EPA notified LP that it was potentially liable for CERCLA costs at the site of its Oroville sawmill. For the next several months, LP and EPA worked out the terms of a plan for the investigation and evaluation of that site which was intended to be incorporated into a consent order.[6] Although LP agreed to perform all the work described in the plan, a dispute arose relative to those provisions of EPA's proposed consent decree relating to work additional to that specified in the initial plan. EPA proposed that the only remedy LP would enjoy if it disagreed with EPA over the need for additional work was to invoke the dispute resolution provisions. Notwithstanding those provisions, however, LP would be subject to $5,000 per day in stipulated penalties. These penalties were not to be subject to judicial review nor would they be stayed by the pendency of the dispute resolution proceedings.[7]

In due course, LP informed EPA that it would not agree to the stipulated penalties provisions insofar as they apply to potential future work orders.[8] EPA responded that it would modify the proposed consent order so that LP could dispute the imposition of penalties, but only if LP won the underlying dispute concerning additional work. LP again did not want to risk the possibility of the massive penalties and proposed a good faith provision, i.e., that the penalties for failing to conduct the further work would not be imposed if LP challenged them in good faith. LP also proposed as an alternative that the consent order include a provision for judicial review of the appropriateness of the amount of penalties.[9] EPA refused to make these concessions and told LP that it would hire its own contractor to do the investiga-

---

*state Ins. Co.,* 523 F.Supp. 148, 151 n. 2 (E.D.Cal.1981).

5. Unless denominated as a disputed fact or an allegation, the facts recited in section I are the undisputed and relevant facts pertinent to the unconstitutional conditions motions.

6. In the patois of CERCLA, the work plan is called an "RI/FS," which stands for Remedial Investigation Feasibility Study. As explained by EPA, the objective of an RI/FS is to assess the extent of contamination, to evaluate risks to public health and the environment, and to evaluate means to appropriately address contamination.

7.· The section on stipulated penalties applied to the entire consent order without any specific provisions relative to possible future work orders. It provided:

"A. Except with respect to any extensions allowed by EPA in writing or excused by the provisions of Article XIII (Force Majeure), for each day in which LP fails to submit a report or document, or in which LP otherwise fails to achieve the requirements of this Order, LP agrees to pay the sum set forth below as stipulated penalties. These penalties shall accrue commencing upon LP's receipt of the written determination of disapproval, as specified in Article V, or upon the failure of LP to meet the schedule specified in the RI/FS Work Plan (Attachment 1), or upon written notice from EPA to LP that a violation of this Order has occurred. These penalties are not subject to Dispute Resolution (Article XI). Dispute Resolution shall not stay the accrual of these stipulated penalties.

"B. Stipulated penalties shall accrue in accordance with paragraph XII(A) above in the

amount determined by EPA, not to exceed $5,000.00 per day."

8. In its September 30, 1986 letter to EPA, LP stated that "Although LP is willing to sign a consent decree which would give EPA the option to impose administrative penalties up to a maximum of $5,000 per day for any failure by LP to perform work required by EPA as part of the Phase I plan described in the work plan, LP is not able to agree that EPA can unilaterally impose such penalties if there are legitimate disagreements over further work. As EPA has interpreted the proposed consent decree in our several meetings, if LP and EPA have a legitimate disagreement over the scope of work beyond that specifically described in the work plan, EPA could impose such penalties and essentially foreclose LP's ability to resort to dispute resolution."

9. Specifically, LP proposed that EPA delete the sentence "These penalties are not subject to Dispute Resolution (Article XI)" and that the consent order be modified to read:

"C. As part of any judicial review of an EPA decision pursuant to Article XI, or as part of any other judicial review of any aspect of the RI/FS Work Plan, LP may request that the court review the appropriateness of the amount of penalties, if any, determined by EPA pursuant to subparagraph (B) of this Article. The court may, in its discretion, assess a higher or lower penalty, taking into consideration all the facts and circumstances including the relative merits of EPA's and LP's positions on the underlying dispute submitted to the Court for resolution."

tion. The costs of this investigation form the basis of EPA's recovery action against LP.

While the facts noted above are not disputed, other potentially material factual disputes remain. LP tenders evidence supporting its argument that the stipulated penalties provision was the sole reason for the breakdown in negotiations. EPA counters with evidence that the scope of LP's initial investigation plan fell "far short" of what EPA was looking for in an investigation. EPA allegedly concluded that LP could be allowed to do the investigation only if the consent order "include[d] a meaningful commitment from LP to perform additional work, as necessary, to assure EPA that a complete RI/FS would be conducted." It contends that the proposed stipulated penalties were included to ensure that the additional work was done in a timely manner. Thus EPA asserts that it was not its insistence on LP's waiver of a constitutional right which caused the breakdown in negotiations and EPA's decision not to authorize LP to conduct the investigation of its sites, but rather it was LP's inadequate proposal for conducting the investigation.

## II

### *THE NATURE OF UNCONSTITUTIONAL CONDITIONS*

■ The doctrine of unconstitutional conditions provides that the Government cannot condition the receipt of a government benefit on waiver of a constitutionally protected right. It functions to insure that the Government may not indirectly accomplish a restriction on constitutional rights which it is powerless to decree directly. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[10]

The doctrine has long been recognized, finding its origin in *Barron v. Burnside*, 121

U.S. 186, 7 S.Ct. 931, 30 L.Ed. 915 (1887). Almost 50 years ago, the high court explained that "constitutional guarantees, so carefully safeguarded against direct assault, [should not be] open to destruction by the indirect but no less effective process of requiring a surrender which, though in form voluntary, in fact lacks none of the elements of compulsion." *Frost & Frost Trucking Co. v. Railroad Comm'n*, 271 U.S. 583, 593, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926). *See also Parks v. Watson*, 716 F.2d 646, 650 (9th Cir.1983) ("the government may not impose a choice between the government benefit and the exercise of a constitutionally guaranteed right"). Although it has been suggested that the doctrine has been "somewhat eroded," Lawrence H. Tribe, *American Constitutional Law* § 10–8, at 681 (2d ed. 1988), the Supreme Court's recent reliance on it demonstrates continued vitality. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72, 110 S.Ct. 2729, 2735, 111 L.Ed.2d 52 (1990).

Nonetheless, this court would be less than candid if it did not acknowledge that the occasions when the doctrine is applied and when it is not are difficult to predict. *See Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218, 288 n. 12, 93 S.Ct. 2041, 2078 n. 12, 36 L.Ed.2d 854 (Marshall, J., dissenting); *California v. LaRue*, 409 U.S. 109, 137, 93 S.Ct. 390, 407, 34 L.Ed.2d 342 (1972) (Marshall, J., dissenting). Moreover, despite its venerable age, the jurisprudence concerning the doctrine of unconstitutional conditions is both undeveloped and uncertain; indeed, it has been described as "a doctrine in search of a theory." Kathleen M. Sullivan, *Unconstitutional Conditions and the Distribution of Liberty*, 26 San Diego L.Rev. 327 (1989).[11]

---

**10.** The Supreme Court explained that "this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.... For if the [rule were otherwise the] government could 'produce a result which [it] could not command directly....' Such interference with constitutional rights is

impermissible." *Perry*, 408 U.S. at 597, 92 S.Ct. at 2697 (citation omitted).

**11.** The lack of a developed underlying theory may help explain the apparent haphazard application of the doctrine. The court notes that recent academic attention has been devoted to attempts at development of a general theory which both justifies the doctrine and makes predictable its application. *See, e.g.,* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L.Rev. 1413 (unconstitutional conditions analysis

What the recent academic examination adverted to in note 11 has made plain is that, although there is a uniformly felt need for a doctrine constraining indirect governmental pressure on the exercise of constitutional rights, no easy or perhaps single rationale for application of the doctrine exists.[12]

Unlike academics, of course, I am not charged with resolving theoretical enigmas, but rather, with deciding concrete cases. Nonetheless, the absence of a tenable theoretical base and what frequently appear to be inconsistent results renders decision-making an uncertain task. Accordingly, I turn to the task at hand with less than full confidence.

 Because 42 U.S.C. § 9604(a) provides EPA with discretion to grant or deny a potentially responsible party authorization to conduct the study, the Government need not engage in settlement negotiations relative to conducting the investigation at all. *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 93 (1st Cir.1990); *United States v. Serafini*, 781 F.Supp. 336, 339 (M.D.Pa.1992) (same). Thus no constitutional issue would arise if the Government had entirely refused LP an opportunity to perform. As I have explained, however, under the doctrine of unconstitutional conditions, the fact that the Government need not provide a benefit does not mean that it can condition receipt of that benefit unlawfully.

LP and its supporters assert that EPA breached the boundary of constitutional conduct when it conditioned consent to LP's conducting the statutorily required investigation on its stipulating to severe penalties for failing to properly and timely complete future unspecified work even if there were a good faith dispute, and by insisting on the waiver of judicial review of such stipulated penalties. The question is whether these proposals are properly viewed as no more than a legitimate offer to compromise potential litigation, or an unlawful effort to withhold a benefit unless LP surrendered a right guaranteed by the Constitution.

 As will be explained below, I conclude that an unconstitutional conditions allegation in the context of settlement negotiations requires a three-step analysis.[13] First, the plaintiff must establish that a constitutional right is implicated; second, the plaintiff must demonstrate that the right is being impinged upon as measured by standards applicable to a direct violation of the identified constitutional right; third, if the plaintiff satisfies these two preconditions, the Government must demonstrate the propriety of seeking a waiver of a constitutional right in light of both its legitimate interest in a waiver, if any, and the benefit to be conferred upon the

rationalized by examination of "the systemic effect of conditions on the distribution of rights in the polity as a whole"). *Id.* at 1421; Richard A. Epstein, *Foreword: Unconstitutional Conditions, State Power and the Limits of Consent*, 102 Harv. L.Rev. 4 (November 1988) ("the doctrine of unconstitutional conditions … function[s] in a variety of contexts as a check against the political perils of monopoly, collective action problems and externalities"); *id.* at 15; Seth F. Kreimer, *Allocational Sanctions: The Problem of Negative Rights in a Positive State*, 132 U.Pa.L.Rev. 1293 (July 1984) (distinguishing between governmental "threats," i.e., allocations that make a citizen worse off because of exercise of rights and "offers," which expand the range of options leaving the citizen better off).

12. Central to the problem of developing a theoretical rationale are three interrelated problems: first is the notion that the Constitution inhibits governmental conduct but does not ordinarily command allocation of resources. Thus Justice Holmes argued that no constitutional implica-

tions can be drawn from conditioning a benefit when the government had a right to refuse to grant it at all, *see Frost & Frost Trucking Co. v. Railroad Comm'n*, 271 U.S. 583, 602, 46 S.Ct. 605, 610, 70 L.Ed. 1101 (1926) (Holmes, J. dissenting); second is the difficulty of establishing a baseline against which the coercive effect of the government's action may be evaluated; i.e., an historic baseline may produce results quite different from a baseline premised on notions of equality, or other potentially applicable baselines, *see* Kreimer, *Allocational Sanctions*, 132 Pa.L.Rev. 1363; and finally, is the difficulty in distinguishing between choice and coercion in this context, *see, e.g.,* Sullivan, *Unconstitutional Conditions*, 102 Harv.L.Rev. at 1428–54.

13. It seems clear to me that the unconstitutional conditions rubric covers a multitude of sins. The analysis the court employs in the text appears appropriate to cases invoking the doctrine in a settlement context. It is far from clear that the analysis would apply in other contexts.

adverse party.[14]

## III

### DOES THE DOCTRINE OF UNCONSTITUTIONAL CONDITIONS APPLY TO OFFERS OF SETTLEMENT?

■ The United States contends that application of the doctrine of unconstitutional conditions makes no sense when the issue is tendered in the context of an offer to compromise litigation and the right allegedly impinged is that of judicial review.[15] The Government makes the not unreasonable observation that each time a party agrees to resolve litigation short of trial, it necessarily surrenders the right of judicial review. Application of the doctrine under such circumstances, it contends, would make every offer of compromise tendered by the United States vulnerable to attack. To avoid this patently unreasonable result, the Government argues that the doctrine should only apply in the context of an offer of settlement if the government seeks to compel waiver of a right other than that of judicial review.

The Government's argument is not without merit. Nonetheless, it appears to this court that the contention must fail for two reasons—one relating to the terms of the instant offer, and the other based on precedent.

While it is true that every offer of compromise involves a mutual surrender of a right of judicial review, that surrender is grounded on the resolution of presently contested issues relating either to the existence of liability or its extent, as measured by events which have already transpired. Here, however, the

Government's proposed "settlement" was of an entirely different character. What the Government proposed was not a mutually agreed upon resolution of presently disputed issues arising out of historical events; rather, it proposed an unreviewable right to define the extent of LP's future liability premised on its evaluation of facts not yet in existence or, at the very least, not yet ascertained. The nature of the Government's offer suffices to distinguish it from conventional offers of settlement, and undermines the logic of the Government's argument relative to the offer at bar. Moreover, binding authority requires rejection of the Government's position.

It is true that the Ninth Circuit has been less than wholly consistent on the issue at bar. At one time that court seemed to suggest, as the Government does, that the doctrine of unconstitutional conditions is inapplicable to offers of settlement. *See Honolulu Rapid Transit Co. v. Dolim*, 459 F.2d 551, 553 (9th Cir.), *cert. denied*, 409 U.S. 875, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972) ("the doctrine of unconstitutional conditions does not strip state and federal governments of [the] indispensable and long acknowledged power [to conclude commercial bargains])." Compromises of litigation, the *Dolim* Court said "pass[ ] out of the range of the Fifth Amendment" when "parties, supposedly with due regard to their own interests, bargain between themselves as to compensation." *Id.* Since that time, however, the Circuit has repeatedly found the doctrine of unconstitutional conditions applicable to offers of settlement, *see Parks v. Watson*, 716 F.2d 646 (9th Cir.1983) (distinguishing *Dolim*);[16] *United*

---

**14.** The court has allocated obligations for demonstration based on the litigation posture of the parties relative to the particular issues, and the potential for possessing the relevant evidence. *See United States v. Veon*, 538 F.Supp. 237, 245–46 (E.D.Cal.1982) ("The general rule is that the proponent of a motion bears the burden of proof"); *and see Sierra Club v. Watt*, 608 F.Supp. 305, 320 (E.D.Cal.1985) ("it is not uncharacteristic of our system that the burden of persuasion is placed on the party most likely to possess the evidence").

**15.** LP and the third-party defendants assert that the issue here is not the offer of settlement conditioned upon waiver of a constitutional right, but rather is the premising of the issuance of a

discretionary permit upon an unconstitutional condition. That contention simply ignores the fact that the offer was made in the context of contemplated litigation. As I explain in the text, that context defines the relative interests of both the Government and LP.

**16.** I leave to others an evaluation of the convincing character of the distinction found by the subsequent panel. It may be, however, that the *Dolim* Court was saying no more than that under the circumstances there presented the parties had reached a mutually satisfactory and uncoerced disposition, and thus, the private litigant had voluntarily waived his rights. Nonetheless, a waiver is the essence of every unconstitutional conditions case, i.e., the claim in such a case is

*States v. Geophysical Corp.*, 732 F.2d 693 (9th Cir.1984); *Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1399 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). Whatever else may be said about this disparate set of cases, it appears clear that in this circuit the mere fact that a proposed or executed settlement of litigation is in issue is insufficient to relieve the Government of exposure to attack premised on the unconstitutional conditions doctrine.

I conclude that both as a matter of the facts alleged in this case and precedent, the Government's contention that offers of settlement are not subject to attack on the grounds that they violate the doctrine of unconstitutional conditions must be rejected. That is not to say that the litigation context is irrelevant to resolution of questions relating to the propriety of offers to exchange benefits for a waiver. Below, after outlining the method of determining whether the doctrine of unconstitutional conditions has been raised at all, I will address how the litigation context bears on the issues tendered by such a case.

## IV

### IS A CONSTITUTIONAL RIGHT IMPLICATED BY THE INSTANT OFFER?

■ Because the doctrine of unconstitutional conditions only applies where surrender of a constitutional right is at stake, the plaintiff's initial burden is to demonstrate that a constitutional right is implicated, and to specify which one. *See Soto v. City of Sacramento*, 567 F.Supp. 662, 670 (E.D.Cal. 1983) ("Identification of the constitutional right implicated by a plaintiff's allegation is not a mere academic exercise. The evolving [constitutional] jurisprudence recognizes that each constitutional right carries its own standard for violation.").

that the Government offered to provide something it is not obligated to do, in return for a surrender of a constitutional right. If all that is required is that the Government offer something and the private party accept it, the doctrine would never have application.

Here, LP asserts that the proposed consent order violated due process because the severe stipulated penalties for failing to complete future unspecified work had no provision for a stay of their accrual during dispute resolution proceedings, no exception to their imposition even if the challenge to future work was taken in good faith, and because the imposition of penalties was not subject to judicial review.

■ The text of the Fifth Amendment requires that due process inform any loss of life, liberty or property occasioned by governmental action.[17] Where there is a realistic threat of loss of property the mandates of the clause apply. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). It seems clear to this court that the offer of settlement proffered by the Government in this case implicated LP's due process rights in that, as I explain below, at a minimum LP had a due process right to review of the penalties for which it was potentially liable under the settlement, and the offer sought a waiver of that right.

The entire function of the doctrine of unconstitutional conditions is to insure that the Government not achieve indirectly that which it could not do directly. Thus, in the matter before the court, the doctrine functions to insure that the Government not exact a surrender of due process rights under circumstances where the Due Process Clause would prohibit direct circumscription of those rights. In order to prevail then, the plaintiff must establish not only that a constitutional right is implicated, but that imposition of the condition would violate rights protected by the relevant constitutional provision if sought by the Government directly. That determination turns on the standards applicable to the right implicated by the Government's offer.[18] Accordingly, I turn to the standards relevant to the Due Process Clause.

17. The Fifth Amendment provides in pertinent part: "No person shall be ... deprived of life, liberty or property without due process of law."

18. The Supreme Court has, either explicitly or implicitly, resolved unconstitutional conditions claims by an examination of the standards applicable to claims of direct violation of the underly-

While the procedural protections mandated by the Due Process Clause are as "flexible . . . as the particular situation demands," *Premier Communications Network, Inc. v. Fuentes,* 880 F.2d 1096, 1103 (9th Cir.1989) (quoting *Matthews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)), due process requires that government action falling within the clause's mandate may only be taken where there is notice and an opportunity for hearing. *Boddie v. Connecticut,* 401 U.S. 371, 377–79, 91 S.Ct. 780, 785–87, 28 L.Ed.2d 113 (1971). *Cf. Los Angeles County Bar Ass'n v. Eu,* 979 F.2d 697, 705 (9th Cir.1992). The Due Process Clause's purpose is "to protect individuals from a government's arbitrary exercise of its powers." *Redman v. County of San Diego,* 942 F.2d 1435, 1440 (9th Cir.1991) (en banc), *cert. denied,* — U.S. —, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Thus due process requires that a person subject to enforcement of a statutory or administrative scheme be permitted to test the validity of that scheme through judicial review. *Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1119 (2d Cir.1975), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). Government action violates due process not only when it completely denies the opportunity for judicial review, but also when the penalties for disobedience are so enormous that they intimidate a potential challenger from exercising its right of access to the courts. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Thus, an administrative scheme which, through substantial penalty provisions, chills an affected party's right to seek judicial review is unconstitutional. Conversely, an administrative scheme satisfies due process if it allows good faith challenges to be brought without the risk of incurring substantial penalties. *Wagner Seed Co. v. Daggett,* 800 F.2d 310, 315 (2d Cir.1986).

Under the standards articulated above, the offer of settlement proffered by the government in this case sought to compromise LP's constitutional rights. The specter of heavy daily penalties and the required surrender of judicial review all limit due process rights LP would enjoy in the absence of the proposed consent decree.[19]

The United States argues that plaintiff suffered no loss of due process rights because, in refusing its offer, LP retained the opportunity to dispute its liability or certain costs as inconsistent with the relevant statutory standards. *See, e.g., Fairchild Semiconductor Corp. v. EPA,* 984 F.2d 283, 289 (9th Cir.1993) (no due process right to pre-enforcement review); *Barmet Aluminum Corp. v. Reilly,* 927 F.2d 289, 294 (6th Cir. 1991); *Lone Pine Steering Committee v. EPA,* 777 F.2d 882, 887 (3d Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *J.V. Peters & Co. v. Administrator, EPA,* 767 F.2d 263, 266 (6th Cir.1985). I cannot agree. The issue is not whether LP is liable at all under CERCLA, or whether the costs sought by the Government are necessary and consistent with the National Contingency Plan, but rather

---

ing constitutional right. *See, e.g., Western & Southern Life Ins. Co. v. Board of Equalization,* 451 U.S. 648, 667–68, 101 S.Ct. 2070, 2082–83, 68 L.Ed.2d 514 (1981) (state's conditioning of foreign corporation's right to do business on payment of a special tax analyzed under the Equal Protection Clause of the Fourteenth Amendment); *Wyman v. James,* 400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971) (Fourth Amendment reasonableness test applicable to conditioning welfare benefits on the surrender of right to be free of home search without probable cause); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (denial of unemployment benefits for discharge because of religiously motivated refusal to work on Saturdays tested under First Amendment standards).

19. Had LP accepted the terms of compromise and then sought to escape its consequences, the case would arguably raise questions of waiver. *See, e.g., Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) (waiver of right to file a civil rights suit pursuant to 42 U.S.C. § 1983 in exchange for the government's agreement to drop pending criminal charges); *United States v. Navarro–Botello,* 912 F.2d 318, 321 (9th Cir.1990) (in course of plea bargain, criminal defendant may waive his constitutional rights), *cert. denied,* — U.S. —, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). *See also D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972); *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (conditions under which waiver to litigate was obtained are enforceable against the government).

whether EPA could deny LP an opportunity to conduct its own investigation at potentially less cost, because LP would not agree to waive its due process rights to litigate the imposition of potential future costs it considered unwarranted.

## V

### *WAS THE GOVERNMENT'S OFFER JUSTIFIED?*

■ LP has established that the offer of settlement sought the waiver of rights guaranteed by the due process clause in return for providing LP with the benefit of doing its own investigation. Accordingly, it has established a prima facie case under the unconstitutional conditions doctrine, thus shifting to the government the burden of justification. That justification is possible seems relatively clear. No constitutional right is absolute and under appropriate circumstances rights may be waived. These observations take on particular force where, as here, the offer of a benefit in return for a waiver arises in the context of litigation.

■ In section III, above, I rejected the Government's argument that the doctrine of unconstitutional conditions never applied in the context of the settlement of litigation when the right in issue was judicial review. Nonetheless, I conceded the force of the argument that unrestricted application of the doctrine would have untoward results. If every offer involving a waiver of a right of judicial review ipso facto constitutes unlawful conduct, private litigants would always be able to gain the benefit of any offer to compromise litigation without any reciprocal obligation. For instance, so long as a criminal defendant accepted a plea arrangement, thereby waiving various rights including his due process right to a jury trial, the deal would go unchallenged and the defendant would gain the benefit of the bargain. However, if he refused the plea offer and went to trial, he could later claim that no punishment greater than that which would be suffered had he accepted the bargain can be imposed without violating the doctrine of unconstitutional conditions. To prevent such anomalous results, there must be some accounting

for the fact that offers to compromise litigation always involve a waiver of rights. It appears to this court that the litigation context may be given its full, but not undue, weight by permitting offers of waiver of judicial process as a condition of settlement when the waiver is rationally and fairly related both to a legitimate government interest and to the benefit conferred. *See Parks v. Watson,* 716 F.2d 646, 652 (9th Cir.1983) (to pass constitutional muster the proposed condition of settlement must directly relate to the subject of the benefit); *see also Davies v. Grossmont Union High School Dist.,* 930 F.2d 1390, 1399 (9th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991) ("Before the government can require a citizen to surrender a constitutional right as part of a settlement ... it must have a legitimate reason for including the waiver in the particular agreement. A legitimate reason will almost always include a close nexus—a tight fit—between the specific interest the government seeks to advance in the dispute underlying the litigation involved and the specific right waived"); *see also Elrod v. Burns,* 427 U.S. 347, 363, 96 S.Ct. 2673, 2685, 49 L.Ed.2d 547 (1976) ("if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights"). I now examine whether that standard is met by the offer at bar.

■ From the Government's point of view the proposed compromise was highly desirable. If accepted by LP, prolonged litigation would be avoided, and the Government would be assured of an RI/FS paid for by LP and conducted to the extent and in the manner EPA believed desirable. EPA's ability under the offer to satisfy its statutory obligations without prolonged litigation is a legitimate governmental interest. Moreover, the constitutional right sought to be waived is directly implicated by the benefit the Government sought. Put another way, the Government sought the waiver of the right of

judicial review because the benefit of settlement is a termination of litigation.[20]

LP would also derive some benefit from the offered settlement because it, rather than EPA would conduct the study. It appears undisputed that studies conducted by PRP's are substantially less costly than those conducted under EPA sponsorship. *See AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 837–38, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990) ("as courts and commentators have recognized, government cleanup efforts are generally considerably more expensive than cleanups performed by the responsible party") (citing, *inter alia, Intel Corp. v. Hartford Accident & Indemnity Co.,* 692 F.Supp. 1171, 1183 (N.D.Cal.1988), *aff'd in part, rev'd in part,* 952 F.2d 1551 (9th Cir.1991); *Chemical Applications Co. v. Home Indemnity Co.,* 425 F.Supp. 777, 778–79 (D.Mass.1977)). *See also* Kemmerer Affidavit submitted by United States at ¶ 3 ("there is a significant difference in the contractors' scope of work and costs to EPA, depending on whether the work is done directly by EPA, or done by PRPs and overseen by EPA contractors. Naturally, it costs EPA more money if PRPs do not bear the responsibility of performing the work themselves, as EPA, instead of PRPs, would have to pay contractors to do the work").

While the proffered settlement offered LP some potential benefit, that benefit was, at least potentially, illusory. Under the offer, LP was exposed to truly punitive daily penalties without judicial review. Thus the economic benefit LP obtained under the proposed settlement was subject to complete defeat, essentially at the sole discretion of

the agency. In sum, LP was presented with two unenviable choices, continue to litigate at great expense under a statute which imposed strict liability, *see Louisiana Pacific Corp. v. Beazer Materials & Services,* 811 F.Supp. 1421, 1427 (E.D.Cal.1993), or settle without any realistic limitation on potential liability.

■ Under the standards examined above, the doctrine of unconstitutional conditions operates in a settlement context as a limitation upon the government's power to exact a waiver of constitutional rights by, among other things, disallowing the making of an offer which "can't be refused." Put another way, the more an offer is "your money or your life," i.e., the presentation of two undesirable alternatives, the less it is likely to be a legitimate offer of compromise and the more likely it is an attempt to unlawfully coerce the surrender of a constitutional right.[21]

The fact that the Government's offer potentially provided little benefit to LP, standing alone, suggests that the offer was not a good faith effort to settle, and that it is unlikely that acceptance would have been a voluntary waiver. That fact, however, does not stand alone, but rather must be considered in light of the litigation posture of the parties and the statutory scheme.

Common sense teaches that offers of settlement are predicated on the relative strength of the parties' litigation posture. Because CERCLA stacks the deck in favor of the Government, it is not unreasonable for it to offer little to the defendant to induce settlement.[22] Moreover, CERCLA provides

---

**20.** Clearly a different result would flow if the Government sought the waiver of rights unrelated to its interest, *e.g.,* if it required a waiver of the Free Exercise Clause of the First Amendment or waiver of the right to be free from unreasonable searches under the Fourth.

**21.** Although I have phrased the conclusion in purpose terms, I do not mean to imply that application of the doctrine of unconstitutional conditions requires a finding of intentional conduct as a matter of historical fact. While it is certainly true that there are cases which speak in terms of a prohibited governmental purpose, such cases necessarily speak in metaphors. The logical difficulties inherent in antropomorphizing

the Government, i.e., treating the institution of government as if it were a person, and then seeking this fictional person's motive, are analyzed at length in Kreimer, *Allocational Sanctions,* 132 U.Pa.L.Rev. 1293 at 1327–40. In some sense, those difficulties, however, are more matters of logic than practice, since it is wholly appropriate to apply an irrebuttable presumption that the Government "intends" the result of its conduct.

**22.** Arguably, the very weakness of LP's litigation position raises one of the specters the unconstitutional conditions doctrine was intended to address—the comodification of constitutional rights, i.e., the willingness of a party to sell its

that only when the EPA determines that a PRP will conduct the investigation "properly and promptly" may it be permitted to conduct the investigation. 42 U.S.C. § 9604(a)(1). The Government argues that the condition sought was an effort by EPA to insure that if it permitted LP to perform an RI/FS, it would be accomplished with promptness and propriety. It contends that promptness depends not only on the progress of the work itself but on the speed with which the parties can resolve disputes. EPA argues that given its responsibilities it must be allowed to insist on provisions designed to curtail as much as possible the parties' disputes arising under the consent decree.

The opposing parties argue that the Government may not rely on time and money savings because it will always save time and money by depriving parties of their right to judicial review. In addition, rather than saving time and reducing duplication, they assert that EPA unnecessarily duplicated work done by LP thereby expending more resources than necessary. The first argument proves too much and the second too little.

As to the first argument, all parties settle to save time and money, and if that were a proper objection the Government could never settle. As to the second argument, it is almost inevitable that where there has not been a settlement and the Government rather than the PRP does the RI/FS there will be duplication, if for no other reason than that the PRP will likely need to do a parallel study for litigation purposes.

■■ This case is extremely close. I conclude, however, considering the goals of CERCLA,[23] and the mission of the EPA,[24] that the court cannot say that the Government was unjustified in offering to permit LP

to do the RI/FS only upon surrender of the right of judicial review. Accordingly, the court must grant the Government's motion for summary judgment directed to LP's claim that by virtue of the doctrine of unconstitutional conditions, the Government is precluded from seeking the costs which it incurred because it performed the RI/FS.

## VI

### *RETALIATION*

■■ LP also contends that the United States should be barred from recovery because in response to LP's refusal to give up its due process rights, the United States retaliated by engaging in "vindictive conduct designed to increase the costs of the government-lead RI/FS." It asserts, inter alia, that EPA failed to follow regulations in monitoring its contractors; it improperly awarded certain costs to the contractor; it treated similar contaminations between Koppers and the LP site differently; and it forced the contractor to alter its findings that formaldehyde presented no significant risk to public health.

The United States responds to some, but not all of these specific factual allegations. Rather, it argues that motive is not in issue here. It acknowledges that LP has the right to argue that some of the costs are not recoverable because they are inconsistent with the NCP, *see* 42 U.S.C. § 9607(a)(4)(A) *and United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993), but maintains that LP should not be allowed to "manufacture" a constitutional issue by alleging government improprieties. I cannot agree.

constitutional rights because of the dire consequences of failing to do so. *But see North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (no constitutional impediment to the waiver of trial premised on fear of the death penalty). As I note in the text, the statutory standards for permitting PRPs to perform the RI/FS undermines whatever power this argument might otherwise have.

23. As I have explained previously, "CERCLA's underlying purpose is to ensure the prompt and effective cleanup of waste disposal sites, and to

assure that parties responsible for hazardous substances bore the costs of remedying the conditions they created." *Louisiana Pacific Corp.*, 811 F.Supp. at 1429 (quoting *Mardan Corp. v. C.G.C. Music Ltd.*, 804 F.2d 1454, 1455 (9th Cir.1986)).

24. Because EPA is the agency committed to the protection of the public's interest in maintaining a clean environment, courts are to defer to the agency's exercise of discretion in settling CERCLA actions. *United States v. Cannons Engineering Corp.*, 899 F.2d 79 (1st Cir.1990).

**1256** 

██ The Government is prohibited from retaliating for the lawful exercise of constitutional rights. *See, e.g., United States v. Garza–Juarez,* 992 F.2d 896, 905–06 (9th Cir. 1993) (citing *Blackledge v. Perry,* 417 U.S. 21, 28–29, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974)), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994); *North Carolina v. Pearce,* 395 U.S. 711, 723–24, 89 S.Ct. 2072, 2079–80, 23 L.Ed.2d 656 (1969) (due process prohibits government from prosecuting or imposing a harsher sentence against a defendant merely because he has exercised his right to appeal a conviction); *White v. Napoleon,* 897 F.2d 103, 111–12 (3d Cir.1990) ("[r]etaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution"); *Smith v. Maschner,* 899 F.2d 940, 947–48 (10th Cir.1990) (retaliation for exercise of right to access to courts violates that right); *Valandingham v. Bojorquez,* 866 F.2d 1135, 1138 (9th Cir.1989) (same); *Milhouse v. Carlson,* 652 F.2d 371, 373–74 (3d Cir.1981) (same); *Hansen v. White,* 947 F.2d 1378, 1380 (9th Cir.1991) (retaliation for exercise of political speech barred); *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir. 1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987) (same). The bar against retaliation for the exercise of a constitutional right has been applied in cases alleging unconstitutional conditions. Thus, in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court held that even though the government could discharge the plaintiff for any reason whatsoever and plaintiff had no constitutional right to a hearing prior to the decision not to rehire him, he could nevertheless state a First Amendment claim if the decision not to rehire him was made in retaliation for his exercise of constitutionally protected First Amendment freedoms. *Id.* at 283–84, 97 S.Ct. at 574.

It is true, as EPA notes, that in refusing to agree to the proposed consent decree, LP retained the right to argue that some of the costs are not recoverable because they are inconsistent with the NCP. The availability of that avenue for redress, however, does not resolve the question of whether certain costs were inflated in retaliation for its exercise of its right to due process. While LP will bear the burden of demonstrating both inconsistency with the NCP, *United States v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992) (burden of proof of inconsistency with the NCP rests with the defendant when the government seeks recovery of its costs), *cert. denied,* —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993), and that "but for" EPA's retaliatory actions the costs would not have been incurred, *Mt. Healthy,* 429 U.S. at 285–87, 97 S.Ct. at 575–76 and *Smith,* 899 F.2d at 949–50, the inquiry under each allegation is distinguishable, and therefore each claim must be discreetly examined.

██ Here, disputed issues of fact exist as to whether LP's insistence on the availability of judicial review and the good faith exception to the imposition of penalties for failing to perform future work was the cause of the breakdown of negotiations. Disputed issues of fact also exist as to whether EPA conducted its investigation improperly and whether, if it was conducted improperly and costs of its investigation were increased, these results were the product of retaliation for LP's refusal to waive its due process rights. Accordingly, the United States' motion for summary judgment on LP's affirmative defense of retaliation as it relates to the alleged unconstitutional condition must be denied.[25]

### VII

### *ORDER*

For all the above reasons, IT IS HEREBY ORDERED as follows:

---

**25.** LP seeks to prohibit EPA from recovering any of the costs of the investigation *as a remedy for* EPA's alleged retaliation. That remedy may well be too broad. The nature of the constitutional violation determines the scope of the remedy. *Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Arguably, should LP succeed on its retaliation defense, it would only be entitled to a reduction in the amount of costs taxed to LP that are attributable to the retaliation, i.e., LP would be excused from those excess costs incurred by EPA as a result of its retaliation, but not those costs which would otherwise have been incurred.

1. Louisiana Pacific and third-party defendants' motion for summary judgment on the issue of unconstitutional conditions is DENIED;

2. The United States' motion for summary judgment on the issue of unconstitutional conditions is GRANTED insofar as Louisiana Pacific and third-party defendants assert that recovery by the United States is barred because the proposed consent decree contained an unconstitutional condition; but is DENIED insofar as Louisiana Pacific and third-party defendants assert that the United States intentionally increased the costs of the site investigation in retaliation for Louisiana Pacific's exercise of its constitutional rights.

IT IS SO ORDERED.