**Earlyn CLARK, Plaintiff,**

v.

**COUNTY OF PLACER, et al., Defendants.**

**No. Civ. S–93–1047 LKK.**

United States District Court, E.D. California.

April 19, 1996.

---

Ann Perrin Farina, Eisen & Johnston Law Corporation, Sacramento, CA, for plaintiff.

William P. Brodbeck, Sacramento, CA, for defendants.

## ORDER

KARLTON, Chief Judge Emeritus.

This matter is before the court on cross-motions for summary judgment. After hearing, and supplemental briefing, the motions were taken under submission and are now resolved on the record, briefs, and arguments of the parties.[1]

## I.

### FACTS [2]

Plaintiff is a female race car driver. The All American Speedway ("AAS"), located on the Placer County fairgrounds, is a track on which plaintiff raced from approximately 1985 to 1992. The name All American Speedway is a fictitious business name employed by defendant Placer County Fair Association ("PCFA").

The PCFA is a nonprofit corporation organized under the laws of the state of California. Any resident of Placer County may become a member of the association and its board of directors is elected by its members. Pursuant to a contract with the county, PCFA manages and controls the county fairgrounds. Because Placer County owns the fairgrounds upon which the AAS sits, *see* Defendants' Answer ¶ 7, there is no dispute that the fairgrounds are public property. *See* Plaintiff's Exhibit 28 attached to Declaration of Ann Perrin Farina ("Plaintiff's Ex."), AAS 1992 Rules and Regulations P.R. 2.1 (representing that the AAS track is public property). The contract between the county and the PCFA was entered into in accordance with the provisions of a California statute permitting counties to delegate to nonprofit corporations the conduct of a county fair. *See* Cal.Govt.Code § 25905. The statute requires, inter alia, that any profits derived from any activity on the fairgrounds must be utilized in furtherance of the county

---

**1.** The court will issue two opinions, the first of which will be published. *See Kouba v. Allstate Insurance,* 523 F.Supp. 148, 151 n. 2 (E.D.Cal. 1981).

**2.** Except as otherwise provided herein, the facts stated are undisputed.

event. *See id.*[3] The county and the PCFA operate a joint complaint committee which resolves disputes concerning the PCFA's operations. Under state law, the county of Placer must approve the PCFA's budget and its contracts. Cal.Govt.Code § 25905. Accordingly, under the County's agreement with PCFA, contracts pertaining to vehicle racing events require County approval. *See* Plaintiff's Ex. 1, at ¶ 13. Finally, California law provides that should PCFA dissolve the county would succeed to the association's assets. Cal.Govt.Code § 25906.

## II.

## THE PLEADINGS

Plaintiff sues pursuant to 42 U.S.C. § 1983 alleging that the defendants violated her right to equal protection and due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States. Specifically, she claims that certain racetrack rules were not applied evenhandedly and that she was treated unfairly because she is female. She also alleges that she has suffered a pattern of harassment and discrimination at the hands of other race car drivers, and that race track officials refused to take action against those individuals who intimidated, accosted and threatened her. *See* First Amended Complaint filed September 20, 1993 ("Amended Complaint"), at pp. 7–13.

In a separate cause of action, plaintiff challenges the constitutionality of a litigation waiver that all members of the AAS were required to sign as a condition of racing at AAS. The rule requiring the waiver also provides for the immediate suspension of any individual who challenges the AAS or its officials in court. *See* Plaintiff's Ex. 29, AAS 1993 Rules and Regulations, General Rules 1.3(b) and 1.3(c). The 1993 rules were draft-

ed and released in November 1992, and became effective in January 1993. *See* Plaintiff's Ex. 29.

In addition to the causes of action predicated on the Constitution of the United States, plaintiff alleges sixteen claims premised on state law, ranging from claims based on the state constitution's equal protection and due process provisions to state statutory and common law prohibitions against discrimination, breach of contract, negligence, emotional distress, and other tort recovery theories.

Defendants' motion for summary judgment is based on the proposition that the County Supervisors are immune from suit and that there is no state action within the meaning of § 1983 jurisprudence. Defendants also assert that judgment on the pleadings should be granted as to most of the state law claims. I resolve these issues herein.[4]

## III.

## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Owens v. Local No. 169*, 971 F.2d 347, 355 (9th Cir.1992).

Under summary judgment practice, the moving party

[A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, to-

---

3. Under the statute, the contract between the county and the nonprofit organization "may provide for the use, possession, and management of any public park or fairgrounds ... [and that] ... [a]ll net proceeds received by such nonprofit corporation, from whatever source," shall be deposited in a fund with the County. Cal. Govt.Code § 25905. The contract which was entered into by Placer County and PCFA also recognizes that California law vests the power to hold the Fair with the County "and that all

money constituting gross receipts from or in connection with the operation, holding and conducting of [the] Fair and through the use, possession and management of the Fairgrounds constitute County monies." Plaintiff's Ex. 1.

4. The state law claims, as well as defendants' assertions of immunity from suit, are discussed in this court's unpublished order.

gether with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

■ In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita,* 475 U.S. at 586 n. 11, 106 S.Ct. at 1355 n. 11; *See also First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. at 1592; *Strong v. France,* 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demon-

strate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *see also Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987).

■ In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. at 1593; *See also T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed. R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)); *see also Abramson v. University of Hawaii,* 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce

a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

## IV.

## STATE ACTION

Central to defendants' motion is their assertion that plaintiff's suit under § 1983 does not lie because the statute addresses the conduct of those acting under color of law and here all the conduct complained of is private in character. The question of state action[5] in the matter at bar requires consideration of two separate questions: first, whether for 1983 purposes, the PCFA is really Placer County in another form; and if not, whether its relationship to Placer County is so completely intertwined that, although PCFA was a private actor, the harm attributable to its conduct may be characterized as having been suffered by virtue of state action. I turn first to the question of whether the PCFA is the alter ego of the county under civil rights suit jurisprudence.

### A. Private Corporations as a Governmental Entity

Recently the Supreme Court has had to consider when an entity, private in form is, for purposes of civil rights litigation, really the government. *See Lebron v. National Railroad Passenger Corporation,* 513 U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In *Lebron* the court determined that a corporation created to address governmental objectives and ultimately controlled by the federal government was, for purposes of a *Bivens* action,[6] subject to the strictures of the First Amendment. Because of the identity of standards applicable to state action for *Bivens* and § 1983 purposes, *see American Bankers Mortgage Corporation v. Federal Home Loan Mortgage Corporation,* 75 F.3d 1401, 1409 (9th Cir.1996), this court concludes that a nonprofit corporation organized under the laws of California,[7] operated for the purpose of addressing local governmental objectives and controlled by a county Board of Supervisors, should also be treated as the county government for § 1983 purposes.[8]

That the conduct of county fairs represents a public statutory mission is attested to by the fact that there is a statutory scheme to insure the creation, maintenance and promotion of county fairs. *See* Cal.Govt.Code §§ 25900 *et seq.* Consistent with this public purpose is the statutory declaration that pri-

---

**5.** It is established that the "state action" requirement and the "under color of state law" test for § 1983 actions are identical where both the § 1983 claim and the Fourteenth Amendment claim arise from the same alleged constitutional violation. *See Gorenc v. Salt River Project Agric. Improvement & Power,* 869 F.2d 503, 506 (9th Cir.1989); *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988).

**6.** *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), established a common law cause of action against employees of the federal government for the violation of rights protected by the federal constitution.

**7.** In *American Bankers,* the Ninth Circuit suggested that an element in the *Lebron* court's decision

was that Amtrak, the corporation at issue there, was federally chartered. With the greatest of respect, the Circuit is in error since "Amtrak is incorporated under the District of Columbia Business Corporation Act." *Lebron,* 513 U.S. at ——, 115 S.Ct. at 967, 130 L.Ed.2d at 913. Of course this court is bound by the circuit's holdings, erroneous or not. However, since "Freddie Mac", the corporation at issue in *American Bankers,* "is a corporation chartered by Congress," *id.* at 1406, the Circuit's comments are clearly dicta.

**8.** The court does not regard the fact that at one time the PCFA operated free of the county, *see* Declaration of Dick Guertin, filed May 27, 1995, as a significant distinction between the matter at bar and *Lebron.* California law required this once purely private entity to change its form into that of a public agent in order to conduct of county fairs and maintain the fairgrounds.

vate nonprofit corporations running county fairs are agents of the county. *Id.*[9]

While the circuit has disparaged the maintenance of county fairs, suggesting that do not constitute a "central governmental function," *see ITSI TV Productions v. Agricultural Associations,* 3 F.3d 1289, 1294 (9th Cir.1993), all that is required for the purpose of § 1983 liability under *Lebron* is that the corporation have a "public statutory mission." *American Bankers,* 75 F.3d at 1407. Whether a central governmental concern or not, under California law county fairs are regarded as a local government function, and as noted above, when engaged in that function the PCFA acts as an agent of the local government.[10] While it is true that the PCFA engages in activities which are not governmental in character, such as the auto racing in issue here, since such operations involve the use of the fairgrounds, under the same statute those operations are also undertaken as agents of the county. Moreover, given that the entire profits from such activities by law must be devoted to the fair and the fairgrounds, the extra governmental activities are also intimately related to the governmental objective.

Given the statutory scheme underlying the relationship between the PCFA and the county, and given that all profits must be devoted to the maintenance of public property or dedicated to the discharge of a public purpose, it would appear that the public objective element is satisfied. The control issue, however, presents a close and difficult problem.

*Lebron* determined that Amtrak was the federal government for purposes of a civil rights suit. In *American Bankers,* the circuit also considered whether Freddie Mac was the federal government for civil rights suit purposes. The court distinguished Freddie Mac from Amtrak, among other reasons, because unlike Amtrak the federal government did not control the operations of Freddie Mac "through its appointees." *American Bankers,* 75 F.3d at 1407. Freddie Mac had issued "nearly 60 million common shares and the common shareholders elected 13 of the 18 board members.... [o]n the other hand the law governing Amtrak effectively provided at the time of *Lebron* for complete government control of that corporation's board." *Id.*

In the case at bar, the county's ability to control PCFA presents a mixed picture. On the one hand, the PCFA has a board elected by its members. Thus, it would appear that control of day to day operations are in other than county hands. On the other hand, the statutory characterization of the PCFA as an agent of the county and the operation of the joint grievance committee suggests that even the control of day to day activities is not completely in the hands of the PCFA's board. Moreover, and more significantly, the county must approve all contracts entered into by the PCFA, *see* Cal.Govt.Code § 25905 and Plaintiff's Ex. 1, at ¶ 13, the corporation's budget must be approved by both the county board and the State Department of Agriculture, *see* § 25905, and the corporation must comply with all provisions of law relating to the conduct of county fairs. *Id.* Taken together, the restrictions imposed upon PCFA's autonomy, and the county oversight concerning all financial matters entered into by the corporation, as well as the requirement that all funds be held with and returned to the county, strongly suggest that whatever the make up of the board, ultimate control of the PCFA and its endeavors lies with the county.

Finally, the court notes a significant policy reason for resolving close questions of this nature in favor of a finding of state action.

---

9. Section 25905 provides in pertinent part:
 The board of supervisors may contract with a nonprofit corporation or association for the conducting of an agricultural fair, as agent of the county, for a period of not exceeding five years. Such contract may provide for the use, possession, and management of any public park or fairgrounds by such nonprofit corporation, as an agent of the county, during the period of the contract.

10. The function of the PCFA in putting on the county fair is indistinguishable from the function of District Agricultural Associations, which have been held to be local agencies, at least for purposes of the state's environmental laws. *See Lewis v. Seventeenth Dist. Agricultural Ass'n,* 165 Cal.App.3d 823, 211 Cal.Rptr. 884 (1985).

As the Supreme Court noted in explaining its decision in Lebron, "[t]he constitution constrains governmental action 'by whatever instruments or in whatever modes that action may by taken.'" *Lebron,* 513 U.S. at ——, 115 S.Ct. at 971, 130 L.Ed.2d at 918. The court went on to explain "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed by the constitution by simply resorting to corporate form." *Id.,* at ——, 115 S.Ct. at 973, 130 L.Ed.2d at 921. Those observations clearly apply to counties as well. Today, no one would think a county could, consistent with the Constitution, privatize in form its public parks to maintain segregated use premised on race. *See Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). Yet a county's ability to assume a private form, if not subject to critical examination would have that very effect.

While the matter is not without doubt, the court concludes that for purposes of determining state action, PCFA is the county and subject to suit under § 1983. Because the question is a close one, I will also examine whether a suit under § 1983 lies, even if the PCFA is properly viewed as having an identity separate from the county for purposes of suit under the statute.

### B. Private Action deemed State Action

The Supreme Court has explained that adherence to the state action requirement " 'preserves an area of individual freedom by limiting the reach of federal law' and avoids the imposition of responsibility on a State for conduct it could not control." *NCAA v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936–37, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982)).[11] Nonetheless, the Court has "said many times that actions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron,* 513 U.S. at ——, 115 S.Ct. at 964, 130 L.Ed.2d. at 909.

The Court has observed that fashioning "a precise formula for recognition of state responsibility is 'an impossible task' which '[t]his court has never attempted,'" *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) (quoting *Kotch v. River Port Pilots Comrs.,* 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093 (1947)), and has candidly admitted that its "cases deciding when private action might be deemed that of the state have not been a model of consistency." *Lebron,* 513 U.S. at ——, 115 S.Ct. at 964, 130 L.Ed.2d. at 909 (quoting O'Connor, J., dissenting in *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 632, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991)).

At least four overlapping tests have been articulated to resolve the question of state action. They have been denominated the Nexus test, *see Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Joint Action test, *see Burton v. Wilmington Parking Authority, supra,* the Public Function test, *see Gorenc v. Salt River Project Agric. Improvement & Power,* 869 F.2d 503 (9th Cir.1989), and the State Compulsion test, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). As the Ninth Circuit has explained, whatever test is employed, they all seek resolution of the question of "whether a State was sufficiently involved in causing the harm to the plaintiff to treat the conduct of the private actor as 'under color of state law.'" *Gorenc,* 869 F.2d at 506.

 Above I concluded that the PCFA may properly be identified as the state for purposes of suit under the civil rights statutes. It follows ineluctably that the state was sufficiently involved so as to treat the conduct of the PCFA as state action for § 1983 purposes even if it is viewed as a private actor for other purposes.

·The circuit has recognized the divergent standards which the Supreme Court has ap-

---

11. Leaving private actors free of federal restraint on conduct which invades another's rights protected from governmental invasion is necessitated by the language of § 1983. To suggest, however, that doing so "preserves an area

of individual freedom" seems perverse. While a statute permitting premeditated murder might be said to preserve an area of individual freedom in one sense, the sense in which it does so is inconsistent with a regime of ordered liability.

plied, and determined that the appropriate approach is to apply the standards employed in the Supreme Court cases whose facts most closely resemble those in the case at bar. *American Bankers,* 75 F.3d at 1409, n. 5. This approach has the salutary benefit of permitting this court not to rush in where its hierarchical superiors have feared to tread.[12]

Applying this method, the court believes that the instant cases is remarkably close to the facts found relevant by the court in *Burton v. Wilmington Parking Authority, supra.* Indeed, if anything, the instant facts are more compelling. Here, as there, the underlying relationship involved the leasing of public property. Here, as there, the relationship was specifically authorized by state statute. Here, as there, the income received from the private party was to be used exclusively for the maintenance of public land. Here, as there, the success of the public function, there a public parking lot, here a county fair, depended on the financial contributions of the private party. Here, as there, the public entity could, through provisions of its lease require equal treatment, there without regard to race, here gender, but had failed to do so. Indeed, the parallels are so remarkable that noting the more compelling facts here, such as the statutory characterization of the PCFA as an agent of the county, the fact that all of the profits from the private endeavor must be dedicated to the public purpose, and that state law requires county approval of the private entities contracts, only serves to gild the lily.

The *Burton* court warned that it was not announcing universal truths. *Burton,* 365 U.S. at 725, 81 S.Ct. at 862. It is also true that a variety of subsequent Supreme Court and Ninth Circuit cases have found that the facts before them did not justify application of the *Burton* result. Moreover, at least some of those cases suggested the need for a "coercive or encouragement" state law element. *See e.g., American Bankers,* 75 F.3d at 1410.[13] Without extended examination of each of those cases, it suffices to note that none of them dealt with the leasing of public property to a private actor under circumstances, if anything, more compelling than the seminal Supreme Court private action case. The court in *Burton* warned that determinations of when the conduct of state lessees would constitute state action was a fact intensive inquiry and that differences in circumstances "beget appropriate differences in law." *Id.* The converse, however, is equally true, when the circumstances are essentially identical, *stare decisis* requires the same result. I cannot but conclude that the facts here require a finding of state action.

For all the above reasons, the court concludes that defendants' motion for summary judgment predicated on a lack of state action must be denied and that plaintiff's cross-motion must be granted.

**V.**

**CONSTITUTIONALITY OF
1993 AAS RULES**

Defendants assert that plaintiff is without standing to sue concerning the constitutionality of the 1993 rules. For the reasons explained below, I cannot agree.[14]

**A. Standing**

 Defendants urge that they are entitled to summary judgment concerning the constitutionality of the litigation waiver because plaintiff has no standing to sue. They

---

12. As noted above the Supreme Court has acknowledged that its cases dealing with the characterization of private action as under color of law for 1983 purposes are in disarray, and that attempting to apply its precedent is to "traverse ... difficult terrain". *Lebron,* 513 U.S. at ——, 115 S.Ct. at 964, 130 L.Ed.2d at 909. Until that court resolves its conflicting precedents, as a matter of prudence, the best subordinate courts can do is to find the High Court case with facts as close to those it has before it and apply that case, hopefully its reasoning, and if that is not possible, at least its result.

13. While it is true that the dissents in *Burton* discussed whether Delaware law required the maintenance of segregated eating facilities, that issue appears to have played no part in the majority opinion.

14. Defendants' contention that suit under § 1983 concerning the legality of the rules does not lie because the PCFA is not a state actor was disposed of above and reiteration concerning this particular claim is not required.

note that while plaintiff challenges the constitutionality of the 1993 AAS Rules, it is undisputed that she did not race on the AAS track in 1993. They conclude that under these facts plaintiff has failed to demonstrate injury in fact.

Standing requires a showing of (1) an injury in fact; (2) a causal connection between the injury and the action by defendants; and (3) a likelihood that a favorable decision will redress the wrong alleged. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992); *Beno v. Shalala*, 30 F.3d 1057, 1064 (9th Cir.1994). The party alleging standing has the burden of proof. *Sierra Club v. Watt*, 608 F.Supp. 305, 314 (E.D.Cal. 1985).

Plaintiff has submitted a declaration which avers that she was ineligible to race at the AAS track by virtue of the 1993 rules and that "but for" the rules, and the discriminatory treatment that she received, she would have raced at the track during the 1993 season. *See* Declaration of Earlyn Clark filed March 24, 1995, at ¶ 2. It is undisputed that plaintiff filed a lawsuit in 1993. Thus, the AAS rule which states that the threat of suit, or the filing of a lawsuit, will result in immediate suspension of racing privileges had a direct and palpable effect on plaintiff's right to race.[15] Having demonstrated an injury in fact and a direct causal relationship between that injury and the rules, and it being clear that this court can grant relief, plaintiff has demonstrated standing. *See United Public Workers v. Mitchell*, 330 U.S. 75, 93, 67 S.Ct. 556, 566, 91 L.Ed. 754 (1947) (where a rule is admittedly violated and a

punishment is mandatory, the fact that the punishment has not yet been imposed is not critical to the standing inquiry).

### B. Constitutionality of the Rules

Both parties seek summary judgment on the issue of the constitutionality of the rules. As I now explain, plaintiff's motion must be granted and the defendants' denied.

Defendants rely on cases such as *Crouch v. N.A.S.C.A.R.*, 845 F.2d 397 (2d Cir.1988) and *Koszela v. N.A.S.C.A.R.*, 646 F.2d 749 (2d Cir.1981) which address private race tracks. Given the court's determination above, that for purposes of this litigation the actions of the PCFA regarding the AAS are under color of law, those cases are inapposite.

Plaintiff relies principally on *Felder v. Casey*, 487 U.S. 131, 139, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988). There, a state statute directly burdened a plaintiff's right to bring suit under § 1983. The Supreme Court applying preemption principles reversed. While *Felder* is informative, it does not directly address the instant issue of a required waiver of a right to sue as a precondition to participation in a governmentally provided activity.

Defendants' requirement of the surrender of the right to sue as a precondition to racing invokes the doctrine of unconstitutional conditions.[16] This court has previously traced the history of the doctrine of unconstitutional conditions, examined its present status and the academic comment on the difficulties attendant upon that doctrine. *See Louisiana Pacific v. Beazer Materials*, 842 F.Supp. 1243 (E.D.Cal.1994). I need not retrace that discussion here. Suffice it to

---

**15.** Rule 1.3b states in pertinent part:
ALL MEMBERS ... EXPRESSLY AGREE THAT THE ALL AMERICAN SPEEDWAY RULES ARE NON–LITIGATABLE AND THEY COVENANT THAT THEY WILL NOT INITIATE OR MAINTAIN LITIGATION OF ANY KIND AGAINST AAS OR ANYONE ACTING ON BEHALF OF AAS.... IF A MEMBER INITIATES OR MAINTAINS LITIGATION IN VIOLATION OF THIS COVENANT ... ALL RACING PRIVILEGES WILL BE SUSPENDED IMMEDIATELY. (capitals in original).
Rule 1.3c states in pertinent part:
BY SUBMITTING AN ENTRY APPLICATION ... A COMPETITOR ... AGREES THAT

SUCH DECISIONS ... [RELATING TO THE EVENT OR ANY MATTERS ARISING OUT OF THE EVENT] ... ARE FINAL, NON–APPEALABLE AND NON–LITIGATABLE. (capitals in original).
*See* Plaintiff's Exhibit 29, AAS 1993 Rules and Regulations.

**16.** Had plaintiff signed the waiver, raced, and then sought to sue, the related doctrine of compelled waiver of constitutional rights would be invoked. *See Louisiana Pacific v. Beazer Materials*, 842 F.Supp. 1243, 1252, n. 19 (E.D.Cal. 1994).

say that the doctrine provides that the "[g]overnment cannot condition the receipt of a governmental benefit on waiver of a constitutionally protected right. It functions to insure that the Government may not indirectly accomplish a restriction on constitutional rights which it is powerless to decree directly." *Id.* at 1248 (citing inter alia *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *Frost & Frost Trucking Co. v. Railroad Comm'n,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926), and *Parks v. Watson,* 716 F.2d 646 (9th Cir.1983)).

As to the related question of waiver, the circuit has explained that whether "waiver of federal constitutional rights is enforceable is a question of federal law, which we resolve by application of federal common law." *Davies v. Grossmont,* 930 F.2d 1390, 1396 (1991), *cert. denied,* 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). The court explained that waivers are judged by a balancing test weighing the private and public interest in enforcement against the interests of the parties and the public in not enforcing the waiver. This court has suggested much the same kind of resolution in the unconstitutional conditions context. I explained that a three step process was required. First, the plaintiff must establish that a constitutional right is implicated; second, the plaintiff must demonstrate that the right is being impinged upon as measured by standards applicable to a direct violation of the identified constitutional right; and third, the Government must demonstrate the propriety of seeking a waiver of a constitutional right in light of both its legitimate interest in a waiver, if any, and the benefit to be conferred upon the adverse party. *Louisiana Pacific,* 842 F.Supp. at 1249–50.[17] I now address those standards.

The Supreme Court has not held that every impairment of a right to access to the courts constitutes an impairment of constitutional dimensions. *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (fees for filing bankruptcy not prohibited by the constitution).[18] The court, however, has held that the constitution prohibits limitation of access when the cases raise issues concerning fundamental rights. *See e.g., Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1940) (wardens review of prisoner habeas petitions), *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (filing fees in divorce). Here, the underlying issue is plaintiff's assertion that she has been denied equal protection premised on gender, clearly an allegation of a right guaranteed by the constitution itself. *See e.g., Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). I conclude that, under the facts of the instant case, a fundamental right is implicated. Because, under the facts of the instant case, the PCFA sought a waiver of access to the courts to enforce that constitutional right, it is equally clear that the right has been impaired. Thus, the question now turns on whether the defendants can demonstrate the propriety of seeking the waiver in light of both its legitimate interest in a waiver, and the benefit to be conferred upon the adverse party.

The defendants seek to justify the waiver premised upon the dangerous nature of racing and their consequent exposure to tort liability if a waiver is not obtained. Whether those considerations justify a waiver in a tort context is not before this court. Even if those considerations suffice in a tort context, they have no application to a suit under § 1983 seeking to vindicate the right to equal protection. I conclude that the defendants

---

17. This court has acknowledged that the "the unconstitutional conditions rubric covers a multitude of sins. The analysis the court employs in the text appears appropriate in the settlement context. It is far from clear that the analysis would apply in other contexts." *Louisiana Pacific,* 842 F.Supp. at 1249 n. 13. While reiterating that notion here, it appears to the court that the issues addressed here and those addressed in *Louisiana Pacific,* are sufficiently close that separate analysis of the issue of the applicable standards is unnecessary.

18. Two possible rights are implicated by defendants' compelled waiver, access to the courts and the right to be free from unequal treatment predicated on gender. While the later right is clearly established, it appears to the court that the waiver implicates that issue indirectly, because it prohibits enforcement of that right in the course of prohibiting all access to the courts. For that reason, the court examines the issue in terms of the direct limitation on access to the courts.

have failed in their burden of showing sufficient interest justifying a waiver in this context, and accordingly, judgment must be for the plaintiff on this issue.

## ORDER

Accordingly, for all the reasons stated above, the court hereby orders as follows:

1. Plaintiff's motion for summary judgment on state action and the unconstitutionality of the AAS 1993 Rules is GRANTED; and

2. Defendants' motion for summary judgment of those issues is DENIED.

IT IS SO ORDERED.