Danica L. SOTACK, Individually and as Administratrix of the Estate of Jess Sotack, Plaintiff,

v.

PENNSYLVANIA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, et al., Defendants.

No. CIV. A. 99–CV–4709.

United States District Court, E.D. Pennsylvania.

June 28, 2000.

---

472

George E. Rahn, Jr., Piper & Marbury, Philadelphia, PA, Jeffrey M. Viola, Saul Ewing Remick & Saul, Philadelphia, PA, for plaintiff.

Lise Luborsky, Britt, Hankins, Schaible & Moughan, Philadelphia, PA, for Pennsylvania Property and Cas. Ins. Guar. Ass'n, Homer A. Rhule, Aaron Tanitsky, defendant.

## MEMORANDUM & ORDER

ANITA B. BRODY, District Judge.

Before me is defendants' motion for summary judgment on the basis that defendants are not state actors.[1] For the

---

[1]. Defendants initially brought this motion pursuant to Federal Rule of Civil Procedure 12(b)(6). The parties agree that the motion should be treated as a motion for summary judgment on the state action issue because all pertinent discovery regarding the state action issue had been completed. In addition, the parties suggested that I address the public status of PPCIGA as a preliminary matter.

following reasons, I conclude that defendant Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA") is a government entity and its operatives are state actors, and therefore, I will deny defendants' motion.

## I. FACTS

In 1993, Jess Sotack was severely injured in an automobile accident. After the accident, Sotack was treated for his injuries at Gnaden Huetten Memorial Hospital (the "Hospital") by Doctors Peter Tey and Athanasios Houides. Sotack died from his injuries on September 4, 1993. At the time of his death, Sotack had various insurance policies, including an automobile insurance policy, a group health insurance policy, an accidental death policy and two life insurance policies. The accidental death and life insurance policies totaled $89,000 and named Sotack's widow, plaintiff Danica Sotack, as their beneficiary. . The group health insurance and automobile insurance carriers paid Sotack's medical expenses, which totaled $193,000, and the proceeds of the life insurance and accidental death policies were paid to plaintiff.

On November 2, 1994, plaintiff filed a wrongful death and survival action against the Hospital and Doctors Tey and Houides. Plaintiff settled the disputes with Tey and the Hospital, but did not settle her claims against Houides. Houides had a medical malpractice insurance policy for $200,000 with PIC Insurance Group, Inc. ("PIC"), but PIC had previously been declared insolvent and placed in liquidation by the Commonwealth of Pennsylvania. Because PIC was insolvent, PPCIGA, pursuant to the PPCIGA Act, 40 P.S. § 991.1801 et seq. ("the Act"), became Houides's primary insurer.

As Houides's insurer, PPCIGA provided counsel to defend Houides against plain-tiff's claims. On June 8, 1998, plaintiff's malpractice claims against Houides proceeded to trial in the Pennsylvania Court of Common Pleas of Monroe County. The jury returned a verdict in favor of plaintiff for $550,000.[2] At trial, PPCIGA, as counsel for Houides, moved for the preclusion of medical bills, a motion granted by the trial judge. On January 29, 1999, plaintiff made a demand on PPCIGA for $200,000, Houides's policy limit under his malpractice policy with PIC.

Three days later, on February 2, 1999, Aaron Tanitsky, a Claims Consultant employed by PPCIGA, informed plaintiff that PPCIGA denied her demand for payment. PPCIGA's stated reason for rejecting plaintiff's claim was that Section 1817 of the Act directs PPCIGA to offset the amount of its payment by the amount that the claimant has received through other insurance policies and that medical benefits and life insurance had already been paid to plaintiff by other insurers. Because the payments to plaintiff by other insurers totaled more than $200,000, PPCIGA offset its entire payment to plaintiff under Section 1817, and therefore, rejected her claim.

Plaintiff then filed this suit pursuant to 42 U.S.C. § 1983 against PPCIGA, Tanitsky, and Homer Rhule, director of PPCIGA, claiming that the defendants acted under the color of state law to deprive her of her constitutionally-protected property right in her insurance policies.[3] *See* Pl. Br. at 6. Defendants now move for summary judgment on the basis that they are not state actors, and therefore, they cannot be liable under § 1983. Plaintiff contends that PPCIGA and PPCIGA operatives are state actors and can be liable under § 1983. Thus, the sole issue in this motion for summary judgment is whether

---

2. The trial court added delay damages and costs to the verdict and entered final judgment for $683,891.90.

3. Although plaintiff alleges a violation of her constitutional right in her insurance contracts, plaintiff may have a due process claim for violating her property right in the trial verdict.

PPCIGA is a state actor for Section 1983 purposes.

## II. DESCRIPTION OF PPCIGA

PPCIGA, created by 40 P.S. §§ 991.1801 et seq., is a mandatory association of all property and casualty insurance carriers that are authorized to write policies in Pennsylvania.[4] *See* 40 P.S. § 991.1803(a). Every insurer is required to participate in PPCIGA as a condition of its authority to write property and casualty insurance policies in Pennsylvania. *See id.; see also, T & N PLC v. Pennsylvania Insurance Guaranty Assoc.,* 800 F.Supp. 1259, 1263 (E.D.Pa.1992). The purposes of PPCIGA are (1) to provide a remedy for claimants when the insurance carrier is insolvent, and (2) to assist in the detection and prevention of insolvencies of insurance carriers. *See* 40 P.S. §§ 991.1801(1), (2). PPCIGA provides a safety-net for insurance claims when the insurance carrier becomes insolvent. When a member insurance carrier becomes insolvent, PPCIGA steps into the shoes of the insolvent carrier and provides a "last resort" remedy for "covered claims." *See* 40 P.S. § 991.1803(b)(2); *see also, Bethea v. Forbes,* 519 Pa. 422, 428, 548 A.2d 1215, 1218 (1988) (J. Zappala, concurring) (stat-

ing that the payment by PPCIGA is a "stopgap measure").

Because the PPCIGA payment is a last resort, claimants are required to exhaust all other insurance policies before filing a PPCIGA claim, and PPCIGA payment must be offset by amounts already paid to the claimant by other insurance policies. *See* 40 P.S. § 991.1817(a).[5] In addition to the offset in Section 1817, PPCIGA payment is limited to a maximum of $300,000. *See* 40 P.S. § 991.1803(b)(1)(i)(B).

PPCIGA is also required to notify the Commissioner of the Department of Insurance of the Commonwealth of Pennsylvania (the "Commissioner") of "any information indicating any member insurer may be insolvent or in such condition that its further transaction of business will be hazardous to its policyholders, to its creditors, or to the public." 40 P.S. § 991.1803(b)(8). After a member insurer has been declared insolvent, the Act mandates that PPCIGA prepare a report for the Commissioner about the history and causes of the insolvency. *See* 40 P.S. § 991.1803(b)(9). PPCIGA is also required, at the direction of the Commissioner, to notify the insureds and any other interested parties that an insurer has been declared insolvent. *See* 40 P.S. § 991.1812(b)(1).

4. PPCIGA was originally created in 1970, under the name Pennsylvania Insurance Guaranty Association (PIGA). *See* Pennsylvania Insurance Guaranty Association Act, 40 P.S. §§ 1701.101 et seq., repealed Feb. 10, 1995. The PIGA Act was based on the State Post Assessment Insurance Guaranty Association Model Bill, drafted by the National Association of Insurance Commissioners (NAIC) in 1969. *See Sands v. PIGA,* 283 Pa.Super. 217, 221, 423 A.2d 1224 (1980). According to defendants, all states have insurance guaranty associations and most of those associations follow the NAIC Model Bill. *See* Def. Br. at 6. Although PIGA was replaced by PPCIGA in 1995, the differences between PIGA and PPCIGA are not relevant to the resolution of the instant motion.

5. Section 1817 provides:
 Any person having a claim under an insurance policy shall be required to exhaust

first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.
40 P.S. § 991.1817(a). The precise scope of the offset under Section 1817 of the Act remains unclear and the issue is presently before the Supreme Court of Pennsylvania. *See McCarthy v. Bainbridge,* 739 A.2d 200 (Pa.Super.1999), *appeal granted,* No. 59 M.D. Alloc. 2000 (May 25, 2000).

In the performance of its duties, PPCIGA is governed by the PPCIGA Act. *See* 40 P.S. §§ 991.1801 et seq. The Act provides for extensive supervision and regulation of PPCIGA by the Commissioner. *See* 40 P.S. § 991.1805. Section 1805 empowers the Commissioner with broad powers over PPCIGA, stating:

> The operations of the association shall at all times be subject to the supervision and regulation of the commissioner. The commissioner or any person designated by him shall have the power of visitation of and examination into such operations at any time in the discretion of the commissioner.

*See* 40 P.S. § 991.1805. In addition to his powers under Section 1805, the Commissioner must approve PPCIGA's proposed Plan of Operations, which governs "the administration of the association." [6] 40 P.S. §§ 991.1803(d)(1), (2); *see also*, Dep. of Steven Perrone, Def. Supp. Br., App. A ("Perrone Dep.") at 30. If the Commissioner considers PPCIGA's proposal unsatisfactory, PPCIGA is required to revise its proposal. *See id.* If the revised proposal is also unsatisfactory, the Act mandates that the Commissioner promulgate a Plan of Operations for PPCIGA. *See id.* Once the Plan is effective, it may be amended only if (1) the Commissioner directs PPCIGA to amend it, or (2) PPCIGA proposes an amendment and the Commissioner approves it. *See* 40 P.S. § 991.1804(c).

The Act also establishes a Board of Directors that governs PPCIGA. *See* 40 P.S. § 991.1803(e)(1). Candidates for the Board are nominated by the member insurers. *See id.* Although the insurance carriers nominate candidates for the Board, the Commissioner must approve all Directors. *See* 40 P.S. § 991.1803(e)(1); *see also*, Perrone Dep. at 13. In certain circumstances, the Commissioner is authorized to appoint Directors unilaterally.[7]

In addition to approving the Board of Directors and the Plan of Operations, the Commissioner must approve all contracts that PPCIGA negotiates. *See* 40 P.S. § 991.1803(c)(1)(4). Moreover, the Act forbids PPCIGA from borrowing funds or delegating any of its responsibilities without prior approval of the Commissioner. *See* 40 P.S. §§ 991.1803(c)(2), 1803(b)(6). PPCIGA is permitted to subcontract with a "servicing facility" to handle claims, but only with the prior approval of the Commissioner. *See* 40 P.S. § 991.1803(b)(6). The Act requires PPCIGA to file an annual statement concerning its operations and financial condition with the Commissioner. *See* 40 P.S. § 991.1806; *see also*, Perrone Dep. at 35. If the Commissioner finds PPCIGA's annual report inadequate, the Commissioner may at any time require PPCIGA to furnish him with additional pertinent information. *See id.*

The Act provides that PPCIGA is funded exclusively from assessments on its members. *See* 40 P.S. § 991.1803(b)(1)(ii)(3). PPCIGA does not collect any premiums, make any profits, advertise, or pay most state taxes. *See T & N PLC*, 800 F.Supp. at 1263; *see also*, 40 P.S. § 991.1807 (exempting PPCIGA from all state fees and taxes, except for certain property taxes).

## III. DISCUSSION

Plaintiff brings her claim under 42 U.S.C. § 1983, alleging that defendants, acting under color of state law, violated her constitutional rights.[8] Defendants

---

6. Specifically, PPCIGA's Plan of Operations establishes procedures for managing its assets, handling claims, and record-keeping of its financial transactions. *See* 40 P.S. § 991.1804(a)(1)-(3).

7. The Act provides that the Commissioner is authorized to appoint Directors if: (1) the member insurers fail to select the required

number of directors within 30 days of the effective date of the Act, or (2) a vacancy on the Board remains unfilled for more than 15 days. *See* 40 P.S. § 991.1803(e)(3).

8. Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ..., subjects, or causes to be

move for summary judgment on the basis that they are not state actors, and therefore, cannot be liable under Section 1983.

 In general, the United States Constitution limits conduct that is fairly attributable to the federal or state governments.[9] *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Therefore, actions of a private entity that are not attributable to the state, no matter how wrongful or discriminatory, remain outside the scope of constitutional liability. *See id.; see also, Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (noting "the essential dichotomy set forth in [the Fourteenth] Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, however discriminatory or wrongful, against which the Fourteenth Amendment offers no shield.") (internal citations omitted). The scope of constitutional liability is limited to state actors for two reasons: (1) to "preserve[ ] an area of individual freedom by limiting the reach of federal law," and (2) to "avoid[ ] imposing on the State ... responsibility for conduct for which they cannot fairly be blamed." *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936–937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Applying these principles, courts must determine whether certain conduct is purely private or whether that conduct is fairly attributable to the government. *See Edmonson*, 500 U.S. at 620, 111 S.Ct. 2077 (stating "courts must consider ... where the governmental sphere ends and the private sphere begins").

 The United States Supreme Court has employed several different analyses to determine whether an entity is subject to constitutional scrutiny. *See Lugar*, 457 U.S. at 939, 102 S.Ct. 2744 (noting that "the Court has articulated a number of different factors or tests in different contexts"). One line of cases focuses on when an organization shall be considered a "part of the Government" itself. *See Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 400, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In *Lebron*, the Court determined that Amtrak was part of the federal government, and therefore, was subject to constitutional limitations. *See id.* at 394, 115 S.Ct. 961. In another line of cases, the Supreme Court focuses on when the specific conduct of a nominally private entity is "governmental in character." *See Edmonson*, 500 U.S. at 621, 111 S.Ct. 2077; *see also, Lugar*, 457 U.S. at 939, 102 S.Ct. 2744. This line of analysis has been referred to as the state action theory.[10] *See id.*

 In applying the state action theory, the Supreme Court has employed a num-

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

9. The analysis in this opinion is completely predicated upon conduct of the defendants that allegedly violated the rights of plaintiff under the United States Constitution.

10. The *Lebron* Court held that there was a separate government entity analysis which differed from the analysis in the state action theory. *See Lebron*, 513 U.S. at 378, 115 S.Ct. 961. The Court never analyzed whether the defendant Amtrak was a state actor under the state action theory, but elected only to address whether Amtrak was a government entity, explaining: "It may not be necessary to traverse that difficult terrain [i.e., the state action theory], since Lebron's first argument is that Amtrak is not a private entity but Government itself." *Id.* Although the Supreme Court drew a sharp distinction between the state action and government entity theories, the application of the two analyses overlap. *See, e.g., Evans v. Newton*, 382 U.S. 296, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (holding that a park that was owned by and in the care of non-government trustees was subject to constitutional limitations because the park served a public purpose and the state was "entwined in the management [and] control of the park").

ber of different tests to decide whether a private entity is a state actor. *See Lugar*, 457 U.S. at 939, 102 S.Ct. 2744. Under one narrow test, referred to as the traditional government function test, a private entity may be considered a state actor if it performs a traditional government function. *See, e.g., Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (holding that a private company that owns and operates a company-town performs a traditional public function, and therefore, is a state actor). Under another test, the state compulsion test, a private entity may be considered a state actor when the state compels the entity to act in an unconstitutional manner. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (holding that a restaurant owner that discriminates on the basis of race when compelled by state law may be a state actor). Under a third, the symbiotic relationship test, a private organization is deemed a state actor when the entity enjoys a symbiotic relationship with the state. *See, e.g., Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (ruling that a privately-owned restaurant that leased its space in a building that was financed by public funds and owned by a state agency enjoyed a symbiotic relationship with the state, and therefore, is a state actor). In yet another test, a private entity can be a state actor if there is a close nexus between the state and the unconstitutional activity of the entity. *See, e.g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *see also, Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 599 (3rd Cir.1979) (holding that a private racetrack operator could be liable as a state actor because its expulsion of a trainer was deemed a disciplinary act of the state racing commission).

■ Plaintiff argues that PPCIGA is a state actor under three of the state action analyses, specifically the traditional government function test, the symbiotic relationship test, and the close nexus test. Defendants contend that PPCIGA does not meet the standards in any of these tests, and therefore, PPCIGA is a purely private actor not subject to constitutional liability. Although the parties address only these state action analyses in their submissions, I have concluded that it is the government entity test in *Lebron* that requires a finding that PPCIGA is an instrumentality of the state and that its operatives are state actors. This case is on all fours with *Lebron*, and therefore, I need not address the parties' arguments concerning the state action theories.

In *Lebron*, the Supreme Court decided that Amtrak was a government entity because of its extensive interdependence with the federal government. *See id.* The *Lebron* Court established three criteria to determine whether an organization is an instrumentality of the government: (1) the entity was created by special law, (2) the entity was created for the purpose of pursuing governmental objectives, and (3) the government controls the entity. *See id.* at 400, 115 S.Ct. 961. The Court held that Amtrak met these criteria:

- It was clear that Amtrak was created by special law. Therefore, Amtrak satisfied the first of the government entity criteria.
- The Court determined that Amtrak was created for the purpose of pursuing governmental objectives. *See id.* at 383–84, 115 S.Ct. 961. In concluding that Congress had created Amtrak for the furtherance of governmental objectives, the Court examined the language of the statute that created Amtrak. *See id.* The Court noted that "Congress established Amtrak in order to avert the threatened extinction of passenger trains in the United States," and that Congress stated in the original Amtrak statute that "the public convenience and necessity required the continuance and improvement of railroad passenger service." *Id.* at 383–84, 115 S.Ct. 961 (internal quotations omitted). The Court also

reviewed the language of the current Amtrak statute, finding that Congress established specific and detailed goals for Amtrak concerning the efficiency of Amtrak's operations. *See id.* at 384, 115 S.Ct. 961. The Court then concluded that Amtrak was created "explicitly for the furtherance of federal governmental goals." *See id.* at 397, 115 S.Ct. 961.

- In evaluating its third criterion, whether the government controls the entity, the *Lebron* Court relied on the fact that a majority of the members of Amtrak's Board of Directors were appointed by the government. *See id.* at 397–98, 115 S.Ct. 961. Because its appointees to the Board of Directors were Amtrak's "policymakers," and directed and controlled the operations of Amtrak, the Court held that the government controlled Amtrak. *See id.* at 98–99, 115 S.Ct. 961.[11]

PPCIGA meets all of the criteria set forth in *Lebron,* and therefore, PPCIGA is also a government entity:

- PPCIGA satisfies the *Lebron* requirement that it was created by special law. It was created by special statute. *See* 40 P.S. § 991.1801 et seq; *see also, T & N PLC,* 800 F.Supp. at 1263 (stating "PIGA is a statutory entity that depends solely on the Insurance Guaranty Act for its existence and for a definition of the scope of its powers, duties and protections").
- PPCIGA satisfies the *Lebron* requirement that it was created to pursue governmental objectives. The PPCIGA Act articulates that the Pennsylvania legislature created PPCIGA to serve the public interest by (1) avoid-

ing financial loss to claimants and policyholders resulting from the insolvency of an insurance carrier, and (2) assisting in the detection and prevention of insurer insolvencies. *See* 40 P.S. § 991.1801(1), (2). That every state has enacted a statute similar to the PPCIGA Act is further evidence of its governmental purpose.

- PPCIGA satisfies the last *Lebron* requirement, that the state controls the entity. The Commonwealth of Pennsylvania controls almost every aspect of the operations of PPCIGA. The Commissioner has virtually limitless authority to supervise and regulate PPCIGA at all times. Under the PPCIGA Act:

 The operations of the association shall at all times be subject to the supervision and regulation of the commissioner. The commissioner or any person designated by him shall have the power of visitation of and examination into such operations at any time in the discretion of the commissioner.

*See* 40 P.S. § 991.1805. Beyond the comprehensive supervision over PPCIGA, the Commissioner can control the composition of the Board. The Commissioner must approve each appointment to PPCIGA's Board of Directors. *See* 40 P.S. § 991.1803(e)(1), (3). Under certain circumstances, such as when a Director's seat remains vacant for 15 days, the Commissioner has the authority to appoint Directors. *See id.* Although the members of the Board are typically not appointed by the government, the state has ultimate control over the composition of the Board. In addition, the Commissioner retains almost complete au-

11. In deciding if the "government control" prong of the *Lebron* analysis had been met, other courts have assessed whether the state controls the operations of the entity. *See, e.g., Clark v. County of Placer,* 923 F.Supp. 1278, 1283–85 (E.D.Cal.1996) (in holding that the Placer County Fair Association is a government entity under *Lebron,* court determined that county retained "ultimate control" over

Association's operations, even though the members of its board of directors are elected by its members); *Jersawitz v. People TV,* 71 F.Supp.2d 1330, 1338 (N.D.Ga.1999) (holding that People TV is a government entity under *Lebron* because "People TV was established and organized by the City for the purpose of pursuing City objectives under the direction and control of City appointees").

thority over the operations of PPCIGA. For example, the Commissioner exercises total control over PPCIGA's Plan of Operations. The Plan of Operations governs PPCIGA's procedures for managing the assets, handling the claims, and keeping the records of PPCIGA's financial transactions. *See* 40 P.S. § 991.1804(a)(1)-(3). The Commissioner must approve PPCIGA's proposed Plan of Operations before it becomes effective. *See* 40 P.S. § 991.1803(d)(2). If PPCIGA's proposal is not satisfactory to the Commissioner, the Commissioner is authorized to promulgate a binding Plan of Operations. *See id.* After a Plan of Operations becomes effective, PPCIGA may not revise the Plan without the prior approval of the Commissioner. *See* 40 P.S. § 991.1804(c). The Commissioner, however, may direct PPCIGA to revise the Plan at any time. *See id.* By controlling PPCIGA's Plan of Operations, the Commissioner controls "the administration of the association." 40 P.S. § 991.1803(d)(1). In addition to controlling PPCIGA's procedures, the Commissioner oversees much of PPCIGA's other activities. PPCIGA may not enter any contracts, or borrow any funds without the Commissioner's prior approval. *See* 40 P.S. §§ 991.1803(c)(2), (4). PPCIGA may not delegate any of its responsibilities or subcontract a service facility to handle claims without the Commissioner's prior approval. *See* §§ 991.1804(b), 1803(b)(6). Virtually all of PPCIGA's activities are state-supervised, giving the state the degree of control required under the government-control prong of *Lebron.*[12]

Therefore, PPCIGA satisfies all of the elements of the *Lebron* analysis and is a government entity.

 Furthermore, separate and apart from the *Lebron* analysis, when a state court determines that an actor is a state entity, the Third Circuit has instructed that the state court's determination is persuasive on the issue of liability of the entity under Section 1983. *See Mark v. Borough of Hatboro,* 51 F.3d 1137, 1146 n. 9 (3d Cir.1995) (internal citations omitted). In *Donegal Mutual Ins. Co. v. Long,* the Supreme Court of Pennsylvania commented in a footnote that PIGA, the predecessor of PPCIGA, was an administrative agency of the state, stating:

> We note that PIGA made an independent assessment of its liability, and concluded that it was in fact liable as a primary insurer. Courts should accord great deference to administrative decisions made by an agency in its area of expertise.

528 Pa. 295, 302 n. 16, 597 A.2d 1124 (1991). Therefore, under the Third Circuit's instruction in *Mark,* the determination of the Supreme Court of Pennsylvania in *Long* that PPCIGA is a state agency supports the holding that PPCIGA is a government entity under *Lebron.* Because I have concluded that PPCIGA is a government entity, I need not address the parties' arguments under state actor theories.

## IV. CONCLUSION

Because PPCIGA (1) was created by special statute, (2) was created for the purpose of pursuing state objectives, and (3) is controlled by the state, PPCIGA is a government entity under *Lebron,* 513 U.S. at 400, 115 S.Ct. 961.[13] Defendants' mo-

---

**12.** Because PPCIGA is a government entity, the fact that it may have some discretion in performing its statutory duties does not mean that the government does not exercise control over it. According to Pennsylvania law, "[a]dministrative agencies are creatures of the legislature ... and they have only those powers conferred by statute." *Small v. Horn,* 554 Pa. 600, 609, 722 A.2d 664, 669 (1998). Thus, although PPCIGA may have limited dis-

cretion in fulfilling its ministerial obligations, it remains constrained by the Act and under the control of the Commissioner at all times.

**13.** Because PPCIGA is a state entity, it may be immune from suit in federal court under the Eleventh Amendment. *See Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Neither party has raised this issue,

tion for summary judgment on the basis that PPCIGA does not qualify as a state actor is denied.

**AND NOW,** this 28th day of June, 2000, I **ORDER** that defendants' motion for summary judgment (Docket Entry # 7) is **DENIED.**

and therefore, I will refrain from making that determination at this time.